May it please the court, Philip Stillman, and I hope it does please the court since we'll be here for seven weeks. I hope that the issue really that's raised here is, I think, one of standing. And I think that from the first instance, the standing here for Mr. Blixseth seems to me at least apparent. I think that just the court erred in ruling that there was no standing because the exculpation clause at issue here directly affects Mr. Blixseth's property interests. To wit, the Chosen in Action, which Mr. Blixseth may have against third parties, or does have against third parties, are a form of intangible property that are eliminated by this exculpation clause. And so for that reason alone, I think the court has to say that Mr. Blixseth has standing to at least pursue the issue. For example, what claim would you be talking about? Sure, Your Honor. One of the claims, for example, would be a claim against Evdra Blixseth. Evdra Blixseth has certain indemnity claims against Evdra Blixseth that arise from her conduct during the case. And the fact that she's included in this exculpation clause. Would that kind of claim be covered by exculpation clause? As it's written now, yes, Your Honor. Indemnity? Excuse me? You mean the indemnity? Yes, indemnity and contribution would, under the broad scope of this indemnity, under the broad scope of this exculpation clause, could legitimately be argued to bar any claims by Mr. Blixseth on that. And it also raises, I bring up Evdra Blixseth because it's so anomalous. The Liquidating Trust and others have characterized Mr. Blixseth's actions as, let's say, looting the debtor. Well, any looting, and I just use that term from the Liquidating Trust without adopting it, has benefited both Ms. Blixseth and Mr. Blixseth and was done when they were married during a period of community property. They were both owned. And Mrs. Blixseth claims that she was active in the management of these companies. But yet, Mrs. Blixseth finds a way into the exculpation clause. Mr. Blixseth does not. Even though she benefited from whatever it is that was alleged. Maybe she had better lawyers. I'm sorry, Your Honor? Maybe she had better lawyers. Maybe she did. I don't know. But the point is, at this point, whether or not her lawyers were better or not, this exculpation clause improperly includes a number of people. Now, it's been postulated that this is merely, and I think the Bankruptcy Court also said, that this is merely a codification in the plan of quasi-judicial immunity. Well, the problem with that is twofold. One, if it's really just a codification in the plan of quasi-judicial immunity, it's not necessary to be in there. Because any time somebody would be sued, they have an opportunity to raise the issue of quasi-judicial immunity, and it either applies or it doesn't apply. It doesn't need to be in this broad scope type exculpation clause. And the problem with having this exculpation clause written the way it does, it is simple. No matter what people testify, it was the intent of the parties and what the possible scope was, whether that scope is either temporal or by person. The problem is that events that have occurred show that none of those limitations have actually worked. Because notwithstanding the various attempts to clarify the meaning and scope and temporal period applicable to this exculpation clause, two courts, one of which was the Bankruptcy Court itself, have applied the exculpation clause to bar claims, pre-petition claims, against third parties by Mr. Blixoff. One, of course, was against Credit Suisse in Colorado, and that was post-petition, which would clearly fall within the scope of the exculpation clause, even narrowed in the Bankruptcy Court's order. However, it was dealing with the contractual issue of breach of contract by Credit Suisse to Mr. Blixoff for a conduct done in breaching their contract that they had with Mr. Blixoff in his entity's pre-petition. And that was barred by Judge Bremer in Colorado. What's the status of that case? It's ongoing, as I understand it, Your Honor. I think there's other motions. It's a final judgment, and so there hasn't been an appeal? No, no. This was a motion to dismiss, and it was one of the claims. And the other one, of course, was the issue of Stephen Brown, who was Mr. Blixoff's lawyer pre-petition, and Mr. Blixoff sued Mr. Brown, who was also chairman of the UCC, the Creditors Committee. And there were a number of issues raised regarding that in terms of whether, of course, attorney-client privilege trumps the quasi-judicial immunity that Mr. Brown might have. But one of the problems, Your Honors, is this. Not only were there those claims, and evidently there were those claims which could implicate the Barton Doctrine, but there were also pre-petition claims of negligence and malpractice, as recognized by the court, that still applied the Exculpation Clause to bar those claims against Mr. Brown. So assuming we were to agree with your understanding question, what does that get you? Well, what that gets us is I think that the record is fully developed in this court right now that this court can make a decision on whether the plan should have been confirmed or not. But then we get to the equitable mootness before we get to that, so why don't we go there? Correct, Your Honor. And in terms of equitable mootness, this issue has been denied twice in the district court. But obviously it's a timing question. So the fact that it wasn't equitably moot at time A doesn't mean it's not equitably moot now. Well, the fact that the passage of time does not alter whether the claim can be equitably moot or not. The passage of time- It alters whether it's been substantially consummated. Well, Your Honor- And how much? The problem with substantial consummation here is that there's really been the same amount of substantial consummation going back to the beginning of the first appeal, which I would call YMC1, which was in the district court. And in that case, and the case law in the Ninth Circuit is obviously that you can't rush to confirmation when the court has before it all the parties and then say, oh, I've confirmed, I've already substantially consummated the plan. Sorry, I'm amused. How many times we are sitting here in 2014 reviewing an order from 2011? I'm sorry, tell you- Aren't we sitting here from 2014 reviewing a district court order from 2011? Isn't that right? Yes, Your Honor. Why? Timing in the court. We have no- Three years to counter this or something else? We have no- Well, there were various events that took place. And one of the delays, and I'm not sure if this was a delay, was an involuntary bankruptcy that was commenced against Mr. Blixoff that was subsequently dismissed. But I don't think that that's one of the reasons why you're now here today reviewing a 2011 order. The district court took a long time both in deciding the first appeal and the second one, something we have no control over. But what we do know is that the same parties that have been before the court from the beginning are still before the court. And in terms of equitable mootness, the court, the only issue here is, is there a remedy for Mr. Blixoff? What's the remedy you're looking for? Well, in an ideal world, Your Honor, I think the exculpation clause should be struck. And I think that- Is that all? Excuse me? Is that it? Well, I think that in a real world position, I think that the exculpation clause, if dealt with in that manner, would probably address a lot of the issues that Mr. Blixoff has standing to raise in the case. And I think it's- In the first, in your opening brief, you seemed to want the whole plan vacated. And then you sort of started retreating from that. Well, I see I have a minute and 25 left, so I'd like to reserve a minute, if I could, at the end. But you're right, Your Honor. There's-look, there is-obviously, if you reverse a plan, the rule is the plan is a nullity, and it puts the parties in the pre-plan status quo. I reiterate Judge Pius's question. Is that what you're asking for? Are you asking us to strike the exculpation clause? With regard to Mr. Blixoff, or are you asking us to do nothing and remand it? What are you asking us to do? Well, I would ask-I think I ask two things. Preferably, I would like the plan reversed and-or the exculpation clause stricken. And honestly, Your Honor, even though I think we're entitled to a complete reversal, there is- So I don't understand your answer. She says one, two, or three. And your answer was preferably one and two. Is that your answer? Well, actually, Your Honor- In the interest of not wasting any more of your time, do you remember one, two, and three? Yes, Your Honor. Okay. Which of those three would you want? I would like the exculp-I think the fair result here would be striking the exculpation clause or modifying it completely to make sure that it has no effect on Mr. Blixoff. Actually, two or three. I'm not sure. I think that's two or three. Now I'm not sure which one is one, two, or three, but that's what we would do. One is setting aside the entire plan, one is setting aside the exculpation clause, and one is modifying it to exclude Blixoff. So it's fairly simple. You only need three, right? I only need three. But I think the appropriate remedy is at least one. You care about the appropriate remedy? You're representing your client. This is not a platonic universe. Correct. What do you want? Three, Your Honor. There we go. But even as to that, a great deal of the clause seems plainly valid. I mean, insofar as it deals with professionals and the period of the-within the period of the planned negotiation and formation, there seems to be no doubt about its validity. I mean, it seems like if you have any complaint, it's as it relates to maybe Credit Suisse and Adrian, maybe nobody else. Well, some of the parties should not be in there, like Cross Harbor, Credit Suisse. I mean, if you're taking it, either Blixoff, if you're taking a classic quasi-codification of quasi-judicial immunity, something like the appeal tomorrow, it's a lot more narrow than the broad scope today. And as Judge Haddon said in YMC1, approving that exculpation clause, whatever the intent of the parties, was plain error. And so I respectfully submit that it doesn't go from plain error to being perfectly acceptable in the same-when it's the same issue. And I'll just make one- You're sort of chewing into your next case's time. So you're now a minute and 47 into that. If you want to take some more time for rebuttal in this case, we'll give it to you for another case. Your Honor, I would like to make one clarification on the remedy issue, and that is-and it does impact on the bad faith issue. The bad faith issue attacks the entirety of the plan because we're not allowed to present that evidence. So in terms of the exculpation clause, I say three. However, there's the bad faith issue, which I'll address in the next appeal. Thank you. Thank you very much, Your Honor. Okay. Good morning. I'm Andy Patton, and I'm representing the debtors. The effective date of this plan was more than five years ago. Since that time, there's been literally hundreds of millions of dollars that have been-have exchanged hands in the substantial consummation of the case and in transactions that have followed afterwards. There are many, many, many third parties not involved in this appeal who would be- You're not seriously arguing the appellate mootness point, right? Yes, I am, Your Honor. The- You didn't start there. You sort of skipped over it, but that's okay if you're going to go back. I just wanted to know whether you were sort of giving up on it. It seems like I got a pretty slam dunk on that one, doesn't it? On the standings, don't you mean? On the- I'm sorry, did I say mootness? I meant- Yes. I'm sorry. I meant standing. Mootness, standing, all the same. I'm sorry, Your Honor. Actually, you know what I'm talking about. Yes. The first point that Mr. Stillman argued, you're skipping over that? You're giving up on that? Well, I'll go to it right now, Your Honor. No, I'm sorry. I didn't mean to break up your argument. If you want to preserve it, you can talk about it at any time. Well, there's a couple points that I want to make with regard to standing. But I think that the equitable mootness really is, in our view, what should drive the decision in this particular case. What is the answer to my question about why this has taken so long? And is that relevant? Well, I think it's relevant, Your Honor, in that there's been so much that's happened. Well, I know. But also, if it's taken that long through no fault of Mr. Blix's, then why is he stuck with it? Well, the beginning point of why it's taken so long to be 2009 and not 2011, because all of these things have happened since 2009. But I think I don't know that anybody in particular is at fault for it taking five years to get here. We've gone up and down the district court and then back and then back to district court and then to here. Mr. Blix did not get a stay pending all of his appeals. But the egg is scrambled and the toothpaste is out of the tube and all of the other phrases that we see in the equitable mootness decisions. But there are amazing things we can do with technology nowadays. I wouldn't be surprised if we could unscramble eggs and there's a squeezed toothpaste back in the tube. What about the remedy that Mr. Tillman suggested? Fine. If you can't unscramble that part of the egg, at least we want the starvation clause modified as to Mr. Blix's. The that doesn't seem to require undoing much of anything. Well, it actually does, your honor, because when when and I think that the target that Mr. Stillman is referring to is credit Swiss and when the exculpation clause, which was in every iteration of the plan until it was confirmed, the single change was to add credit Swiss as one of the exculpated parties. The reason for that is because that there were all sorts of threats of litigation that were being thrown about by various parties. I can understand why they would want this, but my question is different. Why can't that part of the plan be undone? Why is that? The passage of time doesn't seem to have affected that aspect of it. We could leave everything in place and consider. I'm not saying we would reverse or not reverse, but the question is now whether the passage of time has made it moot so we can't even look at it. So why can't we look at that part of it and say, well, you know, we're not going to mess with anything else. But at least we could see whether this is valid or not. And if it's not valid, hardly seems appropriate for them to get away with having a wholly invalid. I'm not saying it is. I'm just saying if when we get to it, we find it's invalid. It was hardly behooves him to to have the benefit of a clause. It's illegal. It was. You wouldn't argue for that, would you? No, Your Honor. But but the the exculpation clause was, as Judge Kershaw said in his. The ruling is on appeal now. A cornerstone of the settlement. Credit Swiss gave up valuable property rights as part of. No, that's fine. And we could consider that in deciding whether or not to do it. But we're at the prior point. The point is, is this, in your terms, eggs so scrambled they can't be unscrambled. There's not even any point looking at it because as passage of time has, you know, the train has left the station. And we're now talking about the question as well. Is there something to be done about it? And one possibility is to say, we're not going to look at anything else. We're going to look at the validity of the exculpation policy, whether it is or not. And if we can do it, we can then decide whether if it is bad or wrong or illegal, whether in fairness and justice, this is something that should be undone in light of whatever alliance. But we can't even get to it. If the case is now equitably moved. I don't think you can get to it because the case is equitably moved, Your Honor. Credit Swiss, part of the deal, part of the benefit of its bargain was that it would be included in the exculpation. The fact that this went to the, it was written exactly the way it's written now. It went to the district court. The district court said it's facially invalid. It went back, but he didn't vacate it, he didn't clarify it. You go back and you get some clarification, but not in the clause, which could be done, it could still be done. In other words, you could rewrite the clause now to simply say what the district court, what the bankruptcy court said it said. Then you go to the district court in Colorado, which seemed not to realize, for understandable reasons, because it's not in there, what was said to be the limitation. So another, a fourth version is at least clarified to say what the district, what the bankruptcy court said it said and what Credit Swiss said it said. For example, they said, as I understand it quite clearly in the hearing, it doesn't apply to contracts, contract issues. Then they get to Colorado and it does apply to a contract issue. Well, it doesn't apply to pre-petition contracts. But this was a pre-petition contract. Well, but I think in Colorado, they were bringing the pre-petition stuff and making claims based on what happened. But the contract was a pre-petition contract. And there's no reason why the judge in Colorado would know that there's some limitation that isn't apparent on the face. So why don't we at least fix it to say what the bankruptcy judge said it means? Well, Your Honor, I think you could. And why would that be a problem? I think it could be sent back to the bankruptcy court in Montana. And just like they sought permission to... Well, but we don't get there if the case is smooth. You know, to even get there to talk about it, we have to have a live controversy here. So there has to be a public standing. So it seems to me we're past that point. It seems to me pretty much implicitly conceded that this is not, that in fact there is a public standing. Certainly, Mr. Blithus has the arguments to present in Colorado that in an appeal from that decision, that it is outside the scope of the exculpation clause. But the question of whether the exculpation clause... But he wants us to help him. And, you know, if he has a live controversy, why shouldn't we help him by telling the district judge that this is in fact what the clause says? But this is not really your issue. The merits of it is not really your issue. That issue is Mr. Bolina here? I'm sorry, Bolia. Mr. Bolia, yeah, there he is. So maybe he needs to argue. He's not presenting Credit Suisse. It seems to me that's his issue. Yeah, okay. May it please the Court, Daniel Bolina for Credit Suisse. As I agree with everything that Mr. Patton said, we obviously joined in the debtor's brief. Regarding the exculpation clause, we think that Credit Suisse is properly within the clause. That's Merit's question, and that's exactly behind it, but before us. But is there any questions for that, for exculpating? I mean, Credit Suisse's role in all this was essentially as a potential litigation target. It became a creditor. I mean, it was also a creditor, yes, and it was, but it wasn't a professional, and it wasn't, it couldn't possibly have been tariffed because of judicial immunity, could it have? Well, I don't think that we're arguing that, and I think the precedent is the South Edge case that actually Mr. Blixit cites in his brief, that the exculpation clause, it's not a release. It just sets the standard of care in the bankruptcy proceeding. To nothing. It may not be a release, but when you set the standard of care to nothing, then that's pretty good. The standard of care is that there's a carve-out for gross negligence and willful misconduct, and I did want to correct the temporal limitation. The Colorado court, that was explicitly, the conduct was during the Chapter 11 proceedings. The claim was that Credit Suisse breached the agreement by entering into the plan, and they entered into the plan obviously during the Chapter 11 proceedings. So the clause, it does have a temporal limitation, and Credit Suisse, as the bankruptcy court found, was the largest creditor in the case, and they could have appealed this subordination order. The judge found that the debtors likely wouldn't have survived as a going concern if Credit Suisse wouldn't have entered into the settlement. Another thing I didn't quite understand is that there was a lot of discussion in the judge's order on rematch, as I recall about, and maybe in the transcript about, the fact that the exploitation clause was not going to apply to certain matters, but it was never put in the actual provision. So how does that help? The fact that the clause was left exactly the way it was. Well, I think the judge explained that he doesn't believe that the clause actually implicates Section 524E, and so I think, as in the South Edge case, it's just setting the standard. Well, just because it was supposedly having to do with, quote, professional conduct, or quasi-judicial immunity, but that's why I don't understand how Credit Suisse ended up in the middle of it. Well, because Credit Suisse was part of the settlement, was a cornerstone of the plan, and they came together with Cross Harbor and with the other parties and formed the settlement that ultimately became the plan that allowed the debtors to survive. There was also a notion that they could deal with it all within the bankruptcy, but then when this claim was brought against Brown, it was said to be covered by the exculpation clause rather than dealt with within the bankruptcy. We're not involved in the Brown case. But it has to do with the interpretation of the clause. So under this clause, Blixith cannot sue Credit Suisse for pre-petition conduct, post-petition conduct, nothing? No, the clause, Blixith can sue Credit Suisse for pre-petition conduct, and he has. And the court in the Colorado case allowed a pre-petition claim to survive. Against Credit Suisse? Yeah, a tortious interference claim. They dismissed a bunch of other claims for failure to state a claim, and dismissed the contract claim for entering into the plan based on the exculpation clause, but it allowed another claim to survive. And the claim that survived, what is it? I'm not sure. We're not counsel of record in that case, but it's a tortious interference with contract case. I think it has something to do with interfering with Blixith's marital separation agreement with Idra. So are you still arguing standing or not? Yeah, we think that the court was correct that Mr. Blixith doesn't have standing.  There's no direct, immediate, adverse, pecuniary impact on him. But he can't sue. He could have otherwise sued Credit Suisse, and now he can't. I think it comes back to... Isn't that a chosen action, which classically has property rights? Well, I think it comes back to, I think, is that the clause was, all the court was doing was setting the standard of care. The bankruptcy court had... Well, it's the clause that set the standard of care. Why doesn't that affect him? The question is whether he has a concrete interest. If he has a concrete interest, then we get to the merits, and we're past standing. I mean, to say he has no standing, you'd say he's not affected. We could change the clause all we want, and it would have no effect on him. That's the standard. And if you change the standard of care, obviously you change the possible outcome of future litigation, right? That's law school, right? Yes. I remember that far back. So he's got standing, right? He's not seriously arguing otherwise, right? I think there's... I mean, if you have an argument to make, I think now's the time to do it. I think we'd make the argument. Okay. All right. Thank you. Thank you. Okay. You want to take some rebuttal? I guess you're on a real... I know I've already eaten into so much time, so... Yeah. Well, we'll keep track. Thank you very much. We can eat more. Thank you very much, Your Honor. One thing, one elephant in the room that nobody's really addressed here today is the fact of the appellate mandate. And in this case, the district court, when it reversed and called the approval of the exculpation clause, whatever the intent of the parties, to be plain error, the approval to be plain error, and the confirmation of the plan was therefore reversed, the bankruptcy court had one option and one option only, which was to execute that appellate mandate. Instead of executing that appellate mandate, it approved the exact same clause all over again. No, we're familiar with that. Why don't we start and answer the question about the case in Colorado. Opposing counsel, Mr. Bollier, said that the plan that was dismissed in Colorado involved post-petition conduct. Is that right? Yes. It involved post-petition conduct based on pre-petition actions. And so it was a breach of the entry into the plan and benefiting from the plan, as Credit Suisse did, was a breach of Credit Suisse's contractual relationships with Mr. Blixeth pre-petition. And as such, even though it was third party v. third party, and that claim was dismissed based on the exculpation clause. So it wasn't just Credit Suisse signing on and voting for a plan, it was that the specifics of the plan as they applied to Credit Suisse affected Credit Suisse's pre-petition contractual relations with Mr. Blixeth, and those were barred expressly by the exculpation clause. Just like even though Judge Kersher specifically limited the exculpation clause temporarily, he still dismissed claims by Mr. Blixeth against Mr. Brown that were only pre-petition legal malpractice claims. Okay. Based on that. You want to argue another case? Yes, Your Honor. I'll go into the bad faith issue right now. Okay. So let's say you use up about three minutes of your time, so we'll give you seven minutes on that case. Thank you very much, Your Honor. This is a little bit more simple, I think. It seems a lot harder with regard to both the standing and the equivalent. Well, I think because this is part and parcel of an overlap of the other case, I think that's why I say I think the standing with regard to this, it also impacts the standing. If we have standing in what's called appeal number one, the YMCA confirmation, we should have standing in this case. Well, only if you think that the inclusion of the exculpation clause has something to do with bad faith. Well, it doesn't, and that's why at the end I qualified what I said before, and that is this. If the judge, Judge Kersher, said bad faith is irrelevant, pre-petition or bad faith conduct, bad faith petition is irrelevant to whether a plan should be confirmed. Now, Mr. Blix, that's clear contention that the plan itself should never have been confirmed without Judge Kersher examining whether or not. Well, but he did do that in the adversary proceeding. Why are we redoing all of it? Why did he have to redo it all? Your Honor, the problem is that he did not do that in the adversary proceeding. He specifically found in the adversary proceeding that the whole story about this being a bad faith planning wasn't true. Well, see, that's the problem, and of course we're on appeal on that as well, but that's the problem here, because all the way through he excluded that very evidence. He prevented this conflict. Well, that's all right. He had fighted about it in that case, but in terms of this case, there's a district court upholding of that now, right, and it's on appeal. Is that right? Yes, correct, Your Honor. All right. So ordinarily, and I don't know whether this is true in bankruptcy, in federal courts, a district court abiding as res judicata or collateral estoppel. So why isn't there just collateral estoppel on that question right now? Well, I think, Your Honor, that because of the district court approval, I mean, there's several issues that make that case not suitable for collateral estoppel, specifically relating to consent to have a bankruptcy court. The issue of complied consent under Stern v. Marshall, which was left open in the executive benefits case. I mean, one of the issues that executive benefits didn't deal with is the issue of can there be implied consent and to what extent there can be. And so the AP14, as we call that case, raises that very issue, which is going to be before this court. But the problem in AP14 was that every time Mr. Vliksa tried to raise those issues. Can I just hold this case for that one? I'm sorry, Your Honor? Would it therefore make more sense to just hold this case for that one? Well, no, I don't think so, Your Honor, and the following is the reason. They're separate proceedings. But to rely on when Judge Berger made rulings about the grand conspiracy theories it's bandied about. But the problem is that Mr. Vliksa was excluded from taking discovery on that issue and presenting that issue at trial as a defense. But in the confirmation, which is a separate proceeding, the issue of whether there was a bad faith petition, it directly is implicated in the approval process. Did Mr. Vliksa offer any evidence on bad faith at the confirmation hearings? Yes, Your Honor. He tried to, and when it was relented from the district court. How about the first time, before it went up to the district court? Yes, Your Honor. At that time, Judge Kirschner refused to allow us to present that. Did you offer to present it? And we did. What did you offer to present to Judge Kirschner at that time? We had an offer of proof in the first confirmation hearing based on the offer of proof that Judge Kirschner accepted based on the offer of proof made in AP14 when he had excluded the evidence at that time. And then when it was sent back to the... So you say he took an offer of proof and accepted. What did he do? Well, we made an offer of proof that... And did he say, I'll consider that? I believe so in the transcript. But he didn't. And then he made a ruling that it was, that it was, that it was, there was no evidence of that. And then in the second... After it goes back down from the district court. Then it goes back down and the judge, and the district court, Judge Hatton says, I don't need to reach the issue of whether the court had to consider bad faith. And so we get down to the district, to the bankruptcy court, and Judge Kirschner says, not that I find there is no bad faith, but the issue of bad faith as presented, as argued by Mr. Blixa, is irrelevant to the determination of whether the plan was proposed in good faith or not. And I believe that to be just a plain error of law. So if Judge Kirschner wanted to take evidence, make credibility determinations, make a finding, whatever he wanted to do... What evidence did you want to present? Well, that evidence is all, if you take a look at, in our opening brief... What evidence did you want to present to Judge Kirschner that he excluded? I mean, he said he wasn't going to conduct the hearing. So what, who, who did you want to call? What did you want to present to him? Oh, we have, all of the, all of those facts are at pages 10 to 20 of our opening brief, listed out in numbers. And each one of them is... There's a fact, but there wasn't a record. I'm sorry, Your Honor? But what's the record? There's a written offer proof that was submitted to the bankruptcy court after the court refused to allow us to present that evidence. And that listed out all of the documents... In which case? In the confirmation hearing. Okay. In the second, in the second confirmation hearing. And that, and those documents listed out all of the different emails, agreements, statements, that were, that went to show that this was a, this was a bad faith filing, which can therefore not immunize even a good faith client. And so what I'm, what I argue today is that the bankruptcy court erred as a matter of law in not allowing that evidence to be presented and considering that it was irrelevant when it's not irrelevant. Where the district judge said it was, the bankruptcy judge said it was irrelevant. What, where did the district judge, the bankruptcy judge say it was irrelevant? Your Honor, I believe it's in excerpts of the record 3257 is what my notes say. And so the court had an obligation to consider those issues. And by not considering those issues, it erred as a matter of law and therefore abused its discretion. Let's go back to equitable mootness for a while. Yes, Your Honor. If we were to take the view in the other case, that if you sufficiently limit the remedy, it might not be equitably moot. But here the only possible remedy is vacating the entire confirmation, right? The remedy is to vacate the, to vacate the approval, the confirmation of the plan and remand for further proceedings. Why is that equitably moot? Well, Your Honor, the equitable mootness issue is that all the parties are still before the court. Whether this, if this is a bad faith petition, it can still be, the rights of the parties can still be adjusted by the bankruptcy court if it were determined to be. And how? I mean, hasn't the, there's been massive building, there's been sales, there's been loans, there's been construction, there's been four and a half, five years of changes in this whole mountain club project. Your Honor, passage of time, that is through no fault of the court. I'm not talking about passage of time. Well, it is because it's this period of time that's gone by. But the time wasn't just passing. Things were happening. Your Honor, the problem with that theory is, which is the, which is the Appellee's theory, is that even if you reverse the plan and remand it for further proceedings, it still does not affect the rights of those third parties who bought property and so forth. They still have those rights. All we're talking about here is Cross Harbor having paid $115 million only for an asset which it valued only months earlier at $455 million and only came up with $35 million in cash and an $80 million promissory note to cut its lease. But my understanding is that what you're asking, I mean, if you're saying it was all in bad faith, then you're saying there shouldn't be any plan. That's correct. That the whole bankruptcy should go up in smoke. Well, that's correct. That this plan, this plan, Your Honor. Or any plan. Well, that's not, I can't say what, I can't say what any other plan is going to be bound to. If you're speaking on the petition having been filed in bad faith, then you must be saying there shouldn't be a bankruptcy at all. Well, Your Honor, it's not necessary, I need not go that far. Because one of the problems as it affects Mr. Blixeth in this case is that this bad faith petition was designed not only to obtain the assets at a much reduced price from what Cross Harbor had already valued them at, but also to target Mr. Blixeth as the way to subsidize even that $35 million in cash, 23 of which went back to Cross Harbor, subsidize all of Cross Harbor's purchase. That's why one of the emails in the bad faith offer proofs is one where Byrne calls it his brilliant but evil plan. And I'm not sure how strongly he meant it in those specific words. But it was a brilliant and evil plan because it used the bankruptcy to obtain an asset that he valued at $455 million for an outlay of net $12 million in cash, and from which he could then not only obtain all of E.J. Blixeth's marital assets, which were valued at about $400 million at the time of the bankruptcy, but also Mr. Blixeth's assets, which he had at that time. So Cross Harbor would come out net positive, and the court can reverse that plan without affecting any other third-party interests. I thought Mr. Blixeth filed the petition. Am I wrong about that? I'm sorry, Your Honor? I thought Mr. Blixeth filed the petition, the bankruptcy petition, no? No, Your Honor. Mrs. Blixeth, E.J. Blixeth, was asked for... Was in charge at the time. Was asked for and received those assets in the divorce in July. The way she got those assets... And that was before the bankruptcy. That was before. The way she got those assets was an undisclosed $35 million loan secured by all of her interests from Cross Harbor, who acknowledged in one of the e-mails also submitted in bad faith that she was not... they knew she was not institutionally financeable. So who filed the petition then? Excuse me? So who filed the petition? E.J. Blixeth was in control at the time. Except that in September she was in default on this $35 million loan that Cross Harbor made to allow her to finalize the divorce with Mr. Blixeth and obtain the Yellowstone Club asset. And so as part of that default process, Cross Harbor was able to control, literally control, the debtor and what money was spent, et cetera. And it was also obligated to put in $100 million, which if it had done so, there wouldn't have been any need for bankruptcy. But of course, it's a lot cheaper to do what he did and not put $100 million in and take full control. So at the time of the filing of the bankruptcy, Mr. Byrne, Cross Harbor, prepared the plan, told E.J. Blixeth to put it into bankruptcy, and there it went, into bankruptcy. So those are the issues which can easily be reversed, and a new plan created... No, Your Honor. Well, no, Your Honor, there was not a petition for a stay. Or the circuit justice. Not that I'm aware of, Your Honor, no. I mean, that would have been a way of keeping things... Well, we tried, and then at the time, the district court had already ruled that at both times that the appeal was not equitably moved. And so at that point, the need for a stay became moot in itself. And it's not that we're saying that Cross Harbor or the ongoing Yellowstone, reorganized Yellowstone Club... I'm sorry, I don't understand. Why does a need for a stay evaporate? Well, Your Honor, if the stay... If there's no stay... I'm sorry. If there's a ruling that the appeals, let's call it one and two, are not equitably moved, then there's no need to get a further... There wouldn't be a need to get a further stay. Obviously, the ability to get relief hinges on how far down the road we are. So if you want to preserve the status quo in order to give your client... Your client wants the best chance of getting relief, you want to hold the status quo, because that precludes arguments about scrambled eggs and... And toothpaste. Painting stations and stuff like that. Yes. So I don't see at all why, if you saw the thing was bad to begin with, why you wouldn't seek a stay. Well, traditionally... Or why the failure to seek a stay shouldn't be held against your client. Well, traditionally, Your Honor, the need to seek a stay goes directly to the equitable move that's issued. And if all the parties are before the court and there's already a ruling that neither appeal is equitably moved... Well, first, one thing, there wasn't a ruling by this court, so your argument falls fairly flat. And besides which, even if it was not equitably moved then, doesn't mean it wasn't equitably moved later. Well, the only reason it would become equitably moved is by passage of time, because all the parties that are necessary for relief... But things were happening. I mean, you're asking because if time's passing and nothing's happening. But things were happening. But the things that are happening... Your Honor, you're completely correct that things are happening on an ongoing basis. It's a business. And people are, as I said, you know, people are buying properties, et cetera. But that does not deal with the issues that are before the court in terms of a bad faith petition. And let me give you a perfect example of how a bad faith petition, if the plan was completely reversed, could be dealt with. A new plan could be filed where they don't sue Mr. Blitzeth on anything, and Cross Harbor buys the asset, whatever they bought it for, and it doesn't affect the rights of any of the third parties whatsoever. And all the parties that are before the court are the ones who, against whom, relief would be appropriate. Except that this was all subject to a settlement that Prince would never have agreed to, for example. Well, it may or may not be. I mean, we don't need to speculate about that issue, because that issue should be dealt with on remand. And the issue first has to be, we don't want to put the cart before the horse. The first issue is, did the court err in ruling that bad faith was irrelevant? If the answer to that is yes, then it goes back to the bankruptcy court. Then the ramifications of that, although certainly we would welcome it. Let's backtrack way back. I finally have found the place where you claim that the bankruptcy judge said that the filing, the circumstances of the filing wasn't relevant to good faith. And I don't see where it says that. It says, Blitzeth also challenges the defendant's good faith in filing the third amendment plan. The court made specific findings that the plan was filed in good faith, not by any means forbidden by law. And suddenly, the plan is not contrary to the bankruptcy code. The plan is proposed in good faith, et cetera. Where does he say that he wasn't considering the— Your Honor, if it would leave the court, I'd be happy to provide that site in a letter giving that site. But my notes say 3257. I know it's in the record. I was there at the time, and so I apologize. So this was an oral ruling? My recollection was it was both oral. I was at the hearing when we tried in the remand proceedings to present the evidence on bad faith. And my recollection is from the transcript of that, from being there, I remember that Judge Persher saying, it's irrelevant, I don't need to deal with that. So that was a very long answer to my question, was that an oral ruling. And you finally came around to saying, yes, in the most roundabout way I can remember. Let me ask the question one more time and make sure I got the answer. Was this an oral ruling? Your Honor, I'm telling you— I don't need the Your Honor. I don't know. My recollection is the best I can tell you. That's why I offered, in a supplemental letter, to give you the exact citations where that is. Because from my notes, it's apparently not. The record that I wrote down was not. And I believe it to have been both oral and written. And so the roundabout answer is because I remember it orally, but I believe it to be both. And I don't have this, apparently, the correct site in front of me. Generalized allegations of misconduct of parties prior to the bankruptcy is irrelevant to the test of good faith. But that doesn't seem to me to be saying that bad faith prior to the bankruptcy is irrelevant. Your Honor, that's exactly the point. That specific reference— It was just too vague and too general. He wasn't saying that— Well, Your Honor, that's— I don't understand you saying that. That's exactly—that generalized allegations of misconduct was exactly the issues of bad faith that we kept trying to raise. And Judge Kershaw kept excluding. And that's why we submitted a written offer of proof after that. Because it wasn't generalized. And there was no way for him to do that. You can give us a cite later as to where he actually excludes evidence. Sure, Your Honor. That was Crawford and excludes. I will. And thank you for that opportunity. Okay. Anything else? No, Your Honor. But I think in light of all of this, I think that— I'm sorry. You're saying no and then you go on. I was talking about— I am not—I don't—we don't need a summary. You're way over your time, so— Thank you. Your Honor, thank you very much. Appreciate it. Okay. You have about two minutes of your time, so only eight for this case. You and your co-counsel, so you've got about eight. Okay. Thank you, Your Honor. There we go. The issue of this—alleged issues of pre-petition bad faith were heard by the bankruptcy court in just about every hearing from the first day the case was filed until the confirmation hearing. Every hearing, and I believe that our brief cites all of the records where these same issues got brought up and brought up and brought up. Well, they were brought up, but the question is whether there was evidence that was pertinent and wasn't heard. There was claims of bad faith and there was evidence that didn't prove bad faith. Well, but you can't say that if evidence isn't presented and considered. You know, if it's considered, then you can say it does or does not, but if it's excluded altogether— I don't want to hear it because I've already made a ruling on this— then you can't talk about what the evidence says because it's not before us. And the question is, was it proper to not even look at the evidence? Your Honor, it was not excluded. At the second hearing, this July of 2011 hearing, the court didn't have to hear evidence of good faith. The district court, if we look at the district court's order sending it back, said you can take up, if you want to, consideration of good faith then. It didn't require the judge to do that. The judge had heard all of the stuff, all of the claims and arguments and evidence upon which this bad faith was— Meaning that the material that was in this proffer had been earlier in 2009 presented as evidence or that he had looked at it and essentially granted summary judgment on the ground that even if it were all true, it wouldn't matter? And was his reason for it not—this is a lot of questions—but was his reason for it not mattering that it wasn't pertinent or what? Here's how that played out, Your Honor. It was on the first day of the adversary trial. All right, so now we're back to the adversary trial. We're back in May of 2009 or April of 2009, the first day of the adversary trial. We argued all morning about the final pretrial order. The club—that got done. The club got to go first, and before the lawyer could even get to the podium for the club, Mr. Blix's lawyer was at the podium asking to put a witness in out of order. And the judge said, no, put him on when you get your case. And then Mr. Flynn made a 20-page offer of proof about everything that this witness was going to say. And then when it came time to put on their evidence, they didn't offer this guy. They didn't offer the witness. All right, so then ultimately, if you're—so your ultimate issue has to be a collateral estoppel issue. Is that right? Or at least you've got a question. Well— Yeah, in this case. My point is that this good faith or this bad faith was heard ad nauseum by the bankruptcy court. Well, apparently it wasn't heard because they didn't put it on. So the question is, if they now want to put it on, if they now wanted to put it on, say in 2009, if they wanted to put it on in the confirmation proceeding here, I don't know if they did. Is your point that they didn't at that point? In 2009. In 2009, that they—in 2009, instead of offering evidence, they said, we rest on the record of all of the past proceedings. And that past proceedings included five or more hearings in which Credit Suisse at that time was arguing the same things as the bad faith. The court heard all of the same witnesses. They put on the same witnesses at every hearing and said the same thing at every hearing. And in one of them, this evil but brilliant, which is a quote from a movie, thing came up. And it got nowhere. It didn't show anything. But the judge heard it over and over and over and over. And then at the adversary trial, Mr. Flynn wanted the court to hear it again. And the judge said, we'll hear it when you put it on your case. So what evidence did they put on at the confirmation hearing in 2009? None. They offered—they asked the court to take judicial notice of the record in the case. And that was it. That was it? That was it. And then in 2011, when the court didn't have to take any more evidence on bad faith, good faith, the court said it could, but he didn't have to. Did the proponents of the organization plan present on evidence of good faith? Yes. The good faith being what the plan would accomplish, that it was within the substance and meaning of the bankruptcy code, how it was going to literally save the club that was on its deathbed at that point in time. And all of that showed that it was—that the plan was proposed in good faith to accomplish the purposes and objectives of that position. But your legal position is and was that the pre-petition bankruptcy, good faith was not relevant. Is that right? Well, pre-petition bad faith isn't the same good faith, bad faith test as plan confirmation good faith. I understand. But the legal dispute seems to be whether it's pertinent to the plan confirmation good faith. Our position is it's not pertinent at all. That's why I just asked you. What's pertinent is whether the— And it is your understanding that the judge agreed with you about that? Yes. I think he very clearly agreed with us. In that sentence that I just read, that vague sentence? Well, I think that elsewhere in that order he talks about that the test of good faith is not the bad faith, which is the test for dismissing a petition, but is good faith under Section 1129 of the code. And the courts have all uniformly ruled that there are two different tests. It seems to me you're taking two inconsistent positions, none of which is pertinent, by the way, to the equitable mootness, which we should hear about, or the standing question. But you're saying on the one hand he heard all of it. On the other hand, he declared it irrelevant. I think that's true. He allowed it to come in in all of these hearings. But as to this issue, which is before us, he declared it irrelevant. I think that's true. He let it in. So it's irrelevant that he heard it or didn't hear it, because if we thought it was pertinent, and if we reached it because of standing and mootness, we would have to send it back because he never actually considered it. Well, he did hear it. I mean, he heard it. He heard it, but he didn't consider it. Well, but he didn't have to consider it. Your Honor, maybe I'm not... Did Mr. Blixus ever file a motion to dismiss the petition? No. The bankruptcy petition on grounds of bad faith, that it was filed in bad faith? No, he did not. There's a procedure to do that, isn't there? Yes. I can't quote you the code section. But he could have. He could have, yeah. Right. It happens all the time, right? It does happen all the time. When the case is filed for a reason other than taking advantage of the bankruptcy code. One other point I want to briefly make, and that is Mr. Blixus wants to carve out so that he's not subject to this $40 million judgment that you'll hear about in the future. What he doesn't recognize is the debtors sued Mr. Blixus, not the liquidating trust. The suit against Mr. Blixus had nothing to do with the plan itself. It was a claim brought by the bankruptcy estate against Mr. Blixus. And when the plan was confirmed, then the estate simply handed the ball off to the liquidating trustee who then carried it further. And so avoiding the plan isn't going to solve Mr. Blixus' problems. He's still going to owe $40 million. He may not owe it to the liquidating trust, but he owes it to the bankruptcy estate of the Yellowstone Club. There are lots of third parties that have bought property that upsetting the plan leaves them with huge title problems. There are people who have entered into contracts. There's been millions of dollars paid to creditors. How is that all going to be recovered? It isn't simple just to wash and say we go back to the pre-confirmation status quo. We can't do that. There's too many transactions that have run that cannot be reversed as a practical matter, and it's not equitable to try and do that. It's not equitable to all of the other parties, all of the people who have been paid, the people who have bought. So where does Mr. Blixus get stuck with the ruling that may be wrong because the courts and the parties took too long to get appeal perfected? Well, Mr. Blixus is not a creditor in this case, which I think goes to the standing issue, at least in terms of raising the bad faith on plan confirmation. He has no dog in that fight, Your Honor, because... Well, but he cares about the exculpation clause, right? The exculpation clause. He had maybe, probably, I'm not sure, but he may have issues there, but not in terms of the good faith, bad faith. But it doesn't matter. If the exculpation clause is part of the plan, one view of the matter is you can't really, and the exculpation clause is invalid, then one view of the matter is that you have to set aside the plan to do away with the exculpation clause. Now, there may be other things one can do, which is to just do surgery on the exculpation clause, but that also affects other people's rights. Well... Attendance fees, in particular, right? But that's where the equitable mootness comes in, Your Honor. Even if the exculpation clause is invalid, if so much time and, more important than the time, so many transactions have gone on... So we're now back, we've just gone around the barn and we're back to the beginning. So my question is, well, why is Blitzer the one who gets stuck with the harm from that, from the delay? Why should he alone, rather than the other side or anybody else, get the harm caused by the delay? It's not his fault. It's not just the other side, though, Your Honor. There's hundreds of parties that aren't before the court that are going to get stuck. That's my question. Why him? Okay? So don't quibble with the other side or whatnot. Why should he be the one who gets stuck with the... I think that's the way it is with equitable mootness, Your Honor. Well, it is if we say it is. So persuade us why we should say that that's how it is. Well, that should be the way it is because... Why couldn't he just say, look, this big mistake was made, we'll send it back to the bankruptcy court and let the bankruptcy court sit there and deal with its own mess? Well, he should have sought a stay, as Judge Berzon mentioned. Before this court, he didn't try his best to get a stay. But, Your Honor, there's... What are the chances with a granted stay? I don't know, Your Honor. Sometimes it's not worth the money to file the papers. I mean, there's literally hundreds of millions of dollars that you can't get back. I remember when there was a lot of money. Well, it still is, Judge. Meanwhile, there's still... I mean, one thing that troubles me is what is the status of the AP 14 case? It's been briefed in this court? I'm not a court... It's a little bit, Trustee, but I understand it's on appeal. I don't know what the briefing schedule is on that. Because it seems that at least this piece, at least in some degree, depends on it. Well, I know that he had the opportunity to raise his bad faith issues in the... They had two trials in that AP 14. They had one before the plan was confirmed, and then the judge gave Mr. Bliss additional time because he complained after intervening in the case where there was a very expedited schedule, he then complained that he didn't have enough time. So they had another trial about a year later. And it's my understanding that he had full opportunity to put on his good faith bad faith... And that's the one that most directly implicates his current problem, because, as you say, he's not a creditor. So his problem is essentially that he's the target in that lawsuit. That's the biggest problem. And the exculpation clause. He wasn't...he was a target in that lawsuit. The lawsuit started with the Credit Suisse suing the debtor to try and get a judicial declaration that its loan was good and valid and all that. And then the committee sued Credit Suisse to equitably subordinate the loan. Then Mr. Blixas intervened on the same side as Credit Suisse, and then the debtor sued Mr. Blixas for fraudulent transfer. And those issues were all joined and then trialed and tried in the... But as it remains now, the main asset of the plan is the lawsuit against Mr. Blixas. Well, not really, Your Honor. The main asset of the plan was the sale of the Yellowstone Club itself. And that's been accomplished. The club has new owners. All of the club's debts are dealt with. There's been distributions made on account of all the claims that were filed in that case. So to say that the purpose of the plan was to target Mr. Blixas is wrong. Not the purpose of the plan, but a major asset of the plan. Well, it is one of the assets of the plan, certainly. And I don't want to get into the merits of the judgment against Mr. Blixas at this point, but I think you'll find that that judgment was well taken by the Bankruptcy Court. Okay. Thank you. Thank you. Do you have any other questions? We'll give you your way out of time. Thank you, Your Honor. A couple of points. I think the issue with regard to the bad faith in the AP-14 is a – and the bad faith issue as it's presented in confirmation are two separate issues. And I think that in the – How can they be two separate issues? Well, it's the same bad faith, but the legal issues are different. It goes to different legal issues. Is it correct that your position as to the record in this proceeding was it's the record in the other proceeding? No, Your Honor. It was not? No, that's not our position. So what evidence was presented in 2009? In 2009, at the confirmation hearing, we wanted to present evidence of bad faith. The judge wouldn't let us. So we asked – we made the offer of proof based on the statement by Mr. Flynn in AP-14. So in other words, it isn't true that you said the record is that record. It's that you wanted to make a new record, but he said no, so therefore you said look at the other offer. Correct, Your Honor. That's a direct contradiction between the two of you. Because it was a – I think my recollection is it was a 20-page or a very long offer of proof. That's a different question, but the question is were you claiming that you wanted to put the actual evidence on that was propounded in the offer of proof in the 2009 confirmation proceeding? Yes. Or were you saying rely on the record in the other case? No, we wanted to present it in the 2009 proceeding, but were prohibited from doing so. In which 2009 proceeding? I'm sorry? In which 2009? In the original plan confirmation proceeding. And then it went up – that was an appellate issue. Did you also, in whatever you're sending us, give a statement? Yes, Your Honor. Or that occurred. Yes, Your Honor. And then – Now, Mr. – was that Mr. Patton? Yes. Mr. Patton says – just making sure who it's from. Mr. Patton says that this proffer was made only in support of taking the witness out of the term, and then when it came time to – which is what Judge Kershner turned down, and then when it came to actually presenting the mis-explicit case, that evidence was never offered. Offered, rather. Is he right about that? It's a little different, Your Honor. He's half right. And the reason we say he's half right is we had a witness that was leaving the country, and we wanted to take him out of order. And Judge Kershner refused to let us take him out of order, and we made an offer because he was not going to be bailed. But that was in the AP 14. In AP 14. Yes, Your Honor. And then we made that – and then Mr. Flynn made that offer proof in the record. That offer proof in the record detailed what we anticipated the evidence to show with regard to our – this defensive bad case. I think that's my collateral stopper question. Yes, Your Honor. I mean, if in fact that all happened in the AP 14, and if it ultimately holds up, i.e. we don't reverse it, we won't get an appeal, which I assume you're going to complain about all this when you show up, then why won't you get to do it over again? Well, Your Honor, because the issue in AP 14 was not specifically whether the petition, the bankruptcy petition was filed in bad faith or not. There were a number of different legal issues there. I thought that was the whole issue. No, not in AP 14. No, that was just one defense to the entirety of the claim. But it was a defense, and it was one of the issues. But the difference is that in AP 14, that issue did not really – the issues relating in AP 14 were much more involved with the releases and the Merrill Settlement Agreement, et cetera. But the basic question of whether this was all a conspiracy to push the Yellowstone Mountain Club into bankruptcy in order to decrease the price and all that, which is the basis for the bad faith claim, was the same, factually the same. The same evidence. It all happened or didn't happen. The same evidence of bad faith would have been the same evidence of bad faith. Right. So if there were findings made that that all didn't happen, which is what he found, then why isn't that binding on you? I mean, I understand that you're complaining about it on the ground that it was procedurally incorrect in that case, and we'll deal with that when we get to that case. But I don't understand why you'd have to do it over again. Because Judge Persher never made a ruling based on any evidence. He made a ruling on the evidence that he allowed in. That he allowed in, and he excluded that evidence. Right. So you can complain about that, but that's what collateral stuff is all about, right? I mean, if it was tried and findings were made, it was either a valid or invalid finding, and you have the good luck that it's not actually all by the board yet. You're going to get to argue about it yet more. But why do we do it again? Well, collateral estoppel requires that the matter be actually litigated and the parties be ---- It wasn't litigated. It was just litigated with less evidence than you want to go on. It wasn't litigated. It, in fact, wasn't litigated at all. And in the second phase of the case, any of the evidence that we had was excluded from being presented, not just in the first part of the case. But Judge Persher made findings on a record. Correct. It just wasn't the records you wanted to make. Well, he made findings that were not based upon the record. And as you said, that's going to be an issue, that's going to be grist for the AP 14 appeal mill, among other issues, one of which being that Judge Persher had no jurisdiction to even enter a ruling in that case, which is one of the reasons why I don't think collateral estoppel, which is not a mandatory application, should be applied here. But in the confirmation issue, we're talking about a different set of legal question, which is the ---- I think we've noted this one enough. Fine, Your Honor. Okay. Thank you very much for your time. The two cases, I guess, stand submitted.
judges: KOZINSKI, PAEZ, BERZON